IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID C. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 0613 |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Arlander Keys |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

David C. Anderson, born January 26, 1954, seeks summary judgment reversing and remanding for an award of benefits the final decision of the Commissioner of the Social Security Administration, who denied his claim for Disability Insurance Benefits (DIB). 42 U.S.C. § 401 *et seq.* (West 2008). In the alternative, Mr. Anderson seeks an order reversing and remanding the case to the Commissioner for additional proceedings. The Commissioner seeks summary judgment affirming the decision to deny benefits. For the reasons set forth below, Mr. Anderson's motion is granted, and the Commissioner's motion is denied; the case is remanded to the Commissioner, yet again, for further proceedings.

## Procedural History

On July 2, 2001, Mr. Anderson filed an application for DIB, claiming that he was unable to work as of March 26, 2001 because

of a disabling back condition. Record, p. 39. His claim was denied on September 27, 2001. Record, p. 20. On October 22, 2001, Mr. Anderson filed a Request for Reconsideration. Record, p. 25, which was denied on February 8, 2002. Record, p. 19. On March 5, 2002, Mr. Anderson requested a hearing before an Administrative Law Judge (ALJ), Record, p. 30, and on July 16, 2002, ALJ William C. Thompson, Jr. Held the requested hearing in Stockton, California. *See* Record, pp. 277-321. On October 4, 2002, the ALJ issued an unfavorable decision, finding that Mr. Anderson was not disabled within the meaning of the Social Security Act. Record, p. 10. Mr. Anderson then filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on October 18, 2002, Record, p. 6; that request was denied on January 15, 2003. Record, p. 4.

Mr. Anderson then filed an action seeking review of that decision in federal court, and, on November 4, 2003, the United States District Court of the Eastern District of California remanded the case back to the Commissioner.[1]    Record, pp. 353-

---

[1]There's nothing in the record to explain why Mr. Anderson filed in California the first time around and in Chicago this time around. The Court assumes that Mr. Anderson must have relocated in the interim, and, indeed, at the second hearing before the ALJ, he did mention that he and his wife had been looking at real estate in the Midwest. In any event, neither the Commissioner, nor plaintiff's counsel mentions the change of venue, and the Court, therefore, assumes there are no issues surrounding the change or forum choice.

55. Thereafter, on March 11, 2004, the Appeals Council remanded the case to the ALJ for further administrative proceedings in accordance with section 205(g) of the Act. Record, pp. 353-55.

On remand, the case was returned to the same ALJ — ALJ William C. Thompson, Jr. — who held a second hearing on June 7, 2005, Record, pp. 465-97, and issued a second unfavorable decision on September 23, 2005, finding Mr. Anderson not disabled at any time through the date of the decision. Record, p. 340. Mr. Anderson appealed this second decision as well, and the appeals council again denied review, making the ALJ's September 23, 2005 decision the final administrative determination of the Commissioner. Record, pp. 322-23.

Mr. Anderson then filed suit in this district, and, after the parties consented to proceed before a United States Magistrate Judge, the case made its way to this Court's docket. The parties then filed cross-motions for summary judgment, which are now fully-briefed and ready for disposition.

### Factual History

A. <u>Testimony Presented at the Hearing of July 16, 2002</u>

At the first hearing before the ALJ, held on July 16, 2002, the ALJ heard from Mr. Anderson; his wife, Janice Anderson; and a vocational expert named Steven Schmidt. Mr. Anderson testified that he was 48 years old on the date of the hearing, and that he

3

was 5'10" and weighed 225 pounds; he testified that he had graduated from high school and attended Illinois Valley Community College for two semesters. Record, pp. 281-282. He testified that he last worked on March 27, 2001 at Summit Medical Center, where he had worked for seventeen years as a stationary or maintenance engineer. Record, p. 283.

Mr. Anderson testified that, in March 2001, he was forced to stop working at Summit, and that he could no longer work at any job, because of problems he had with his lower back and left leg. Record, p. 288. Mr. Anderson testified that he had a partial discectomy in 1998, which he claimed caused him to have nerve impingement, spinal stenosis, and three ruptured disks on the date of the hearing. *Id.* He testified that his condition was inoperable, and that he was no longer receiving treatment, though he continued to do water therapy three to five times a week for approximately thirty minutes each time. Record, p. 289. Mr. Anderson explained that water therapy was a type of physical therapy that was lower in terms of impact that conventional physical therapy on a treadmill or bike, both of which caused him to suffer back and leg pain. Record, p. 290.

Mr. Anderson also testified that, at the time of the hearing, he was actively treating with Daniel Bruce, a licensed clinical social worker, for depression; he testified that he was

4

seeing Mr. Bruce every four to five weeks through his wife's Employee Assistance Program. Record, p. 291. Mr. Anderson testified that his sessions with Mr. Bruce gave him a "place to vent," and that he had opted not to take any psycho tropic medications. *Id.* He testified that his depressive symptoms included an inability to concentrate and sleep, irritability, and mood swings. Record, p. 292. He testified that the counseling helped him "put things in perspective." *Id.*

Mr. Anderson testified he experienced constant numbness in his left leg and foot due to his lower back condition. *Id.* He testified that he also had muscle spasms in his lower back that traveled down the left buttock into the calf if he sat or stood for too long. Record, p. 293. Mr. Anderson testified that he also had difficulty with concentration and short-term memory, and that he had gained some weight (five to ten pounds) since he stopped working. Record, pp. 293-295.

With regard to his daily activities, Mr. Anderson testified that he was able to do small chores around the house and that he was able to mow his small yard; he testified that he was able to drive short distances and that he tried to get to the gym most days for water therapy. Record, pp. 296-298. Mr. Anderson testified he maintained a social circle, attending dinners at people's houses and barbecues. Record, p. 298. He testified

that, prior to his injury, he enjoyed bike riding, hiking, and doing a variety of home maintenance repairs, all of which were precluded because of his back. Record, p. 308.

Mr. Anderson testified that he could not stand for more than fifteen minutes without experiencing pain and that he could not sit for more than fifteen to twenty minutes at a time; he testified that he could not lift more than ten to twenty pounds. Record, p. 299. Mr. Anderson testified that he took a variety of medications for his pain, including Vicodin, oxycontin, and Flexeril. Record, p. 300. He testified that he also occasionally took morphine sulfate, but that he had not done so since about a month prior to the hearing. Record, p. 300. Mr. Anderson testified that the medications he took for pain made him drowsy, and caused him to nap throughout the day. Record, p. 301.

With regard to his knee pain, Mr. Anderson testified that he iced it up to three times a day, three to four days a week. Record, p. 303. According to the record, thirty-five minutes into his testimony, Mr. Anderson stood up to relieve stiffness and muscle spasms down his left side. Record, p. 304.

Mr. Anderson also testified concerning his treatment with Dr. Weinstein, who advised him that additional surgery could not give any concrete results. Record, p. 305. He testified that, about a year before the hearing, Dr. Gracie Barzaga had

6

recommended an epidural injection to block his pain, but that he had declined to pursue that option. Record, p. 306.

Mr. Anderson testified that he had filed a workers' compensation claim in January 2002, but that, to date, he had not received any money. Record, p. 306. He testified that he has not sought alternative employment since a physician in Modesto told him he could not return to his previous job. Record, p. 308.

Mr. Anderson's wife, Janice Anderson, testified that she has been married to Mr. Anderson for twenty-two years, resided with him, and saw him on a daily basis. Record, p. 310. She testified that, since the 1998 discectomy, Mr. Anderson had been totally incapable of doing any physical activities around the house, with the exception of limited housework and mowing the lawn. Record, pp. 311-12. She stated Mr. Anderson's mood and temperament had changed with his injury, that he had become extremely irritable and depressed; she testified, however, that the treatment with the clinical therapist (Mr. Bruce) seemed to have helped. Record, p. 312.

Mrs. Anderson testified that, following the surgery in June 1998, Mr. Anderson insisted on returning to work, which he did from October 1998 to March 2001. Record, p. 313. Mrs. Anderson testified that, during this time, Mr. Anderson experienced

excruciating pain on a daily basis and that, after work, he would have to sit in his truck for fifteen minutes before he was able to walk into the house. Record, p. 314. She testified that he was typically unable to sleep at night because he was in so much pain. *Id.* Mrs. Anderson testified that her husband became lethargic when on pain medication, and that, because of this, he generally avoided taking it; she testified that the exception to this was Flexeril, which he took every day. Record, pp. 315-316.

In addition to Mr. and Mrs. Anderson, the ALJ heard from Steven Schmidt, a vocational expert (VE). The ALJ described to Mr. Schmidt a hypothetical person with a high school education plus a year in junior college, as well as past relevant work consistent with Mr. Anderson's. Record, p. 316. The hypothetical person, according to the hypothetical posed by the ALJ, was able to lift twenty pounds occasionally and ten pounds frequently; he could sit without limit when not standing or walking, and could occasionally bend, stoop, twist, and squat, but could not kneel, crawl, or climb; he could not work at heights, nor could he operate foot controls. *Id.* The VE determined that this hypothetical person would be able to work in unskilled assembly positions at a light exertional level, of which there were 47,000 in the state. Record, pp. 316-17. The VE testified that there were also 90,000 cashiering positions and

11,000 production inspector positions available, and that a person with the limitations included in the ALJ's hypothetical would be able to do these jobs as well. Record, p. 317.

The ALJ then asked the VE to consider a person who was able to perform light work, "but with the restriction of standing or walking no more than an hour at a time, total of no more than four hours in a day with a sit stand option at intervals of 45 to 60 minutes with the same non-exertionals" as presented in the first hypothetical. *Id.* The VE testified that the only jobs falling within that hypothetical would be unskilled customer service jobs, of which there were 14,000 positions, and unskilled garage attendants, of which there were 6,500 positions. *Id.*

Mr. Anderson's attorney then asked the VE whether the job options would be eroded if the person were unable to concentrate for half of an eight-hour workday due to medication, and the VE testified that they would; he testified that this limitations would result in complete erosion. *Id.* Similarly, the VE testified, if the person were unable to control his need to stand to perform his job during the course of an eight-hour workday, this would result in complete erosion of the occupational base. *Id.*

B.    Testimony Presented at the Hearing of June 7, 2005

At the second hearing, held June 7, 2005, the ALJ again

9

heard from Mr. And Mrs. Anderson and a vocational expert. Mr. Anderson testified that he had not worked since the last hearing, nor had he had any vocational retraining. Record, p. 472. He testified that, in his view, he was prevented from working due to his inability to stay on his legs or sit for long periods. *Id.* He testified that, although he was not being actively treated for his back, he was still receiving medication for his pain from his treating physician, Dr. Patel; he testified that he continued to take M.S. Contin, Flexeril, and Vicodin. *Id.* He testified that he experienced constant pain radiating down the left leg to the foot. Record, p. 473. He testified that he continued water therapy exercises two to three times a week, which "somewhat" relieved the pain. *Id.* He testified that, in general, he felt that his back condition was worse than it was during the previous hearing in 2002. Record, p. 474.

When asked to describe a typical day, Mr. Anderson testified that he watered the flowers, ran the dishwasher, did some laundry, and whatever other chores he could do around the house. *Id.* He testified that he was no longer able to mow the lawn. Record, p. 475. He testified that the only activity he was able to do away from the house was water therapy. *Id.* Mr. Anderson testified that he was still able to drive short distances and that he could go to the grocery store or have dinner with

friends. Record, p. 476. Mr. Anderson testified that he mostly just read, watched TV, and used a computer to pass time; he testified that he was able to read for maybe a half hour at a stretch. Record, p. 477. Mr. Anderson testified he was still able to walk short distances without the assistance of a cane, but that he had to rest after a couple blocks. Record, p. 478. He testified that he was typically able to stand for fifteen to twenty minutes at a time and that he was able to sit for half an hour at a time if he was in his recliner; he testified that he could not sit even that long in a hard chair. Record, p. 479. Mr. Anderson testified that he did not have any problems with his hands that prevented him from dialing the telephone, writing, or using a computer. *Id.* Mr. Anderson testified that he had been on pain medication since he quit working in 2001, and that the medication makes him drowsy and slowed his mental acuity. Record, p. 483.

When asked about his knee, Mr. Anderson testified that he first noticed swelling and pain in 2002, then treated with Dr. Thomas Bielejeski; the knee was a significant problem with Mr. Anderson's ability to walk or stand. Record, p. 484. Mr. Anderson also testified that he had recently had an updated MRI of his lower back, which showed that the disc that had previously been operated on had re-bulged; the MRI also showed two new

11

bulging discs. Record, p. 486.

Mr. Anderson testified that he simply could not envision himself working – both because of his physical condition and because of the effects of his pain medication. Record, p. 486. Mr. Anderson testified that, when he was at home, he was constantly "up and down all day" to relieve his discomfort. Record, p. 487.

Mrs. Anderson testified that she was employed as a human resources manager for American Medical Response, and that she typically worked from 7:30 a.m. to 5:30 p.m., five days a week. Record, p. 488. She testified that her husband was capable of watering flowers and doing laundry, but that he was unable to do much other housework. Record, p. 489. According to Mrs. Anderson, her husband had no activities away from the house and was no longer even able to go to the grocery store. Record, p. 490-491. She testified that her husband's mental outlook had gotten worse since the previous hearing; she testified that he was irritable and "not pleasant" at times. Record, pp. 491-492. She testified that, when he was on pain medication, Mr. Anderson slurred his words, was glassy eyed, and had no concentration. *Id.*

After hearing from Mr. and Mrs. Anderson, the ALJ again heard from a vocational expert, but this time he heard from Susan Creighton-Cavel. Initially, the VE testified that Mr. Anderson's

12

previous employment as a stationary engineer had no skills that would transfer to employment at a lighter exertion level. Record, p. 493. The ALJ then asked the VE to consider a hypothetical 51-year-old with a high school education and past work as a stationary engineer who was able to lift twenty pounds occasionally and ten pounds frequently; was able to stand and walk in combination for about six hours, and to sit without limit when not required to stand or walk; who required an opportunity to shift positions every forty-five to sixty minutes; and who was unable to kneel, crawl, work at heights, or work with hazardous machinery. Record, pp. 493-494. The VE testified that such a person could do certain light, unskilled job positions, including that of officer helper (16,000 positions in California; 135,000 nationally), light cashier (57,000 positions in California; 570,000 positions nationally), and light storage facility clerk (10,000 positions in California; 100,000 nationally). Record, p. 494. The VE stated the DOT classifications did not address whether a person could sit for forty-five to sixty minutes and then stand, but she testified that, during her 30+ years on the job, she had witnessed such accommodations during on-site visits to businesses. *Id.*

Mr. Anderson's attorney then asked the VE to consider whether her opinion would be altered if the hypothetical person

needed to take breaks every fifteen to twenty minutes because of his pain and because of the effects of his pain medication. Record, p. 495. The VE testified that these additional restrictions would completely erode the job base. *Id.* She also testified that, if the person had to leave the work station for more than two to five minutes every forty-five to sixty minutes, he would not be able to perform any of the listed jobs. Record, p. 496.

## C.   **Medical Evidence**

The medical evidence in the record shows that Mr. Anderson has a long history of chronic low back pain with spasms and pain in his back, knees and legs. Record, pp. 128-144. Mr. Anderson had a left-sided L4-5 discectomy on July 3, 1998 to remove a herniated disc. Record, pp. 204-205. On August 14, 1998, Mr. Anderson presented to Dr. Karl Gregorius for post-surgical follow-up; Dr. Gregorius noted that Mr. Anderson had continued severe paraspinous muscle spasms in his lumbar spine; he obtained another MRI which revealed post-surgical changes at L4-5 and mild bulging at L5-S1. Record, pp. 95, 98.

Mr. Anderson filed an application for Social Security Disability Insurance Benefits on July 1, 2001, alleging a date of onset of March 26, 2001 due to degenerative back disorders. Record, pp. 19, 39. On April 11, 2001, Dr. Michel G. Khoury

performed an MRI on Mr. Anderson's lumbar spine, which revealed status-post laminotomy at L4-5 with focal scarring and retraction of the thecal sac; bilateral neural foraminal stenosis with minimal impingement of the L4 nerve roots coursing through the neural foramina worse on the left than on the right; and mild bilateral neural foraminal stenosis and facet arthropathy at L5-S1 with a bulging disc and annular fissure, but without nerve root impingement or disc protrusion. Record, pp. 195-96.

Mr. Anderson received monthly treatment with Dr. Peter G. Lund from April 2001 to February 2002 for back and hip pain. During this time, he was taking Flexeril, Codeine, and Morphine for pain. Record, pp. 184-193, 254-262. On April 2, 2001, Dr. Lund noted that Mr. Anderson had numbness in his left calf and foot, and that his right leg was easily fatigued. Record, p. 261.

On September 7, 2001, Mr. Anderson was evaluated by Dr. Lakshmi Neena Madireddi, who conducted a physical examination and found no lumber tenderness and 80% range of motion. Record, p. 189. Dr. Madireddi diagnosed lumbar disc disease and advised Mr. Anderson that he should not return to his prior line of work. *Id.*

A September 19, 2001 physical residual functional capacity assessment shows that Mr. Anderson was capable of 1) lifting twenty pounds occasionally and ten pounds frequently; 2) standing

and/or walking at least two hours in an eight-hour workday; 3) sitting about six hours in an eight-hour workday; 4) pushing and/or pulling for an unlimited time; 5) occasionally climbing ramps and stairs but never ladders, ropes, or scaffolds; and 6) occasionally balancing, stooping, kneeling, crouching, and crawling. Record, pp. 170-177. An October 11, 2001 physical and mental residual functional capacity assessment completed by his treating physician indicates that Mr. Anderson was diagnosed with chronic lumbar back pain and was determined to be precluded from working due to pain upon bending, stooping, and walking. Record, pp. 179-181. At that time, Mr. Anderson was also determined to be moderately limited in dealing with the public due to irritability caused by pain. Record, p. 181.

Also on October 11, 2001, Mr. Anderson saw Dr. Lund, who noted tenderness over the spine at L5-S1, but no motor weakness or reduced range of motion in the extremities. Record, p. 184. Mr. Anderson's medications at that time included Loritab, Flexeril, Zocor, and M.S. Contin. *Id.* At that time, Dr. Lund recommended a consultation with Dr. Graciela A. Barzaga, who examined Mr. Anderson on November 9, 2001. Record, pp. 251-53. Dr. Barzaga diagnosed a slipped disc at L4-5 with stenosis and status-post laminectomy at L4-5. Record, p. 252. To treat Mr. Anderson's chronic pain, she recommended a series of three

epidural blocks; it appears that Mr. Anderson did not pursue this recommendation.

Another residual functional capacity assessment was completed on February 8, 2002 by state agency physician Dr. Shephard Fountaine, who determined that Mr. Anderson could carry twenty pounds occasionally, ten pounds frequently, stand for about six hours per eight-hour workday, sit for about six hours per workday, and only occasionally perform any postural limitations. Record, pp. 232-239.

A CT scan of Mr. Anderson's lumbar spine was obtained on March 7, 2002. Record, p. 242. Dr. Grant Rogero interpreted the results as showing L4-5 post-surgical changes with a mild disc bulge, some minimal central stenosis, but no evidence of focal disk protrusion. Record, p. 242.

On May 3, 2002, Dr. Lund completed a physical medical report at the request of the SSA. Record, pp. 246-250. Dr. Lund indicated that Mr. Anderson had been diagnosed with lumbar disc degeneration and chronic pain, that Mr. Anderson's prognosis was poor, and that he had had a failed response to treatment. Record, p. 246.

On May 7, 2002, Daniel Bruce, a licensed clinical social worker, completed a mental medical report at the request of the SSA. Record, pp. 267-272. Mr. Bruce indicated that Mr. Anderson

17

had been diagnosed with periodic depression, irritability, frustration, and despair due to pain and physical disability. *Id.* He noted that Mr. Anderson had had a good response to treatment (Mr. Anderson had only treated on four occasions), and stated that Mr. Anderson was psychologically unimpaired with a good prognosis. *Id.*

Mr. Anderson presented to Dr. Thomas Bielejski on June 3, 2002 for evaluation of left knee pain, which had been occurring periodically for the previous five years. Record, pp. 274-275. Dr. Bielejeski concluded that Mr. Anderson had chondromalacia of the left patella, but he did not recommend surgery. Record, p. 274.

On November 12, 2003, Dr. Khoury performed a repeat MRI scan and found a left lateral hyperintense lesion on T1, suggestive of focal scarring in the lateral recess of LS-S1 compromising the left S1 nerve root; the remaining lumbar disks were unremarkable. Record, p. 461. Despite these findings, a comparison to the April 11, 2001 MRI showed no changes in Mr. Anderson's spine. Record, p. 462.

On September 15, 2004, Mr. Anderson underwent a consultative examination by Dr. Madireddi, who provided a detailed functional capacity evaluation. Record, pp. 375-377). Dr. Madireddi found Mr. Anderson capable of the following: 1) lifting twenty pounds

18

occasionally and ten pounds frequently; 2) sitting for six out of
eight hours with the freedom to stand; 3) standing/walking for
six out of eight hours with breaks every two hours; 4) climbing
stairs with guard rails; but not 5) balancing, kneeling,
stooping, crouching, or crawling. Record, p. 377. Dr. Madireddi
also warned that the use of M.S. Contin could raise safety
concerns in jobs requiring alertness. *Id.*

On September 18, 2004, Mr. Anderson underwent a psychiatric
consultation with Dr. Manolito Castillo, who noted Mr. Anderson
had a history of depression due to his inability to work.
Record, pp. 381-382. Dr. Castillo diagnosed Mr. Anderson with a
single episode of major depressive disorder based upon the
history Mr. Anderson provided, but was unable to identify any
significant mental limitations during his assessment. Record, p.
384.

On October 5, 2004, Dr. Michael Kasman completed a
comprehensive agreed Medical Examination, providing a complete
review of Mr. Anderson's medical history to date. Record, pp.
390-439. Dr. Kasman concluded that subjective disability factors
were greater than objective factors, and noted there were non-
organic findings on examination. Record, p. 437. Nonetheless,
he stated that the objective findings would preclude Mr. Anderson
from substantial work, prolonged sitting, and prolonged weight-

bearing. *Id.* He recommended a non-surgical medical award to cure or relieve the effects of Mr. Anderson's industrial injury. *Id.*

On October 15, 2004 and march 3, 2005, Mr. Anderson saw Dr. Rahul Patel for hyperlipidemia and chronic pain. Record, pp. 445-447. Mr. Anderson returned to Dr. Patel on May 19, 2005 with complaints of increased back pain. Record, p. 444. Dr. Patel ordered an MRI, which was performed on May 24, 2005 and revealed a recurrent disc herniation at L4-5 with compression of the nerve root. Record, p. 442.

D. The ALJ's Decision

Based upon this medical evidence and on the testimony heard, on September 23, 2005, the ALJ issued a second unfavorable decision, which Mr. Anderson now asks this Court to review. Applying the five-step sequential analysis prescribed by the Social Security Regulations, the ALJ initially determined that Mr. Anderson had not engaged in any substantial gainful activity since his alleged onset. Next, he determined that Mr. Anderson did have a severe impairment; specifically, the ALJ found that he was "status post left laminectomy at L4-5 . . . and that this condition significantly limits his ability to perform basic work activities and has lasted more than twelve consecutive months." Record, p. 341. The ALJ acknowledged that Mr. Anderson was also

20

claiming disability on the basis of knee pain and depression, but he found that his back issue was the only severe impairment. With regard to Mr. Anderson's knee, the ALJ found that, "[i]n light of the lack of objective medical evidence indicating a medically determinable knee impairment which has had more than a minimal effect on the claimant's ability to work since his alleged onset date," that impairment was not severe. Record, p. 342. With regard to Mr. Anderson's depression, the ALJ determined that this alleged impairment "has had no more than a minimal impact on the claimant's ability to work for any 12 month period and that it is therefore not 'severe.'" Record, p. 344. In so finding, the ALJ gave substantial weight to the opinion of Dr. Castillo, and reduced weight to the opinion of Daniel Bruce, the social worker who served as Mr. Anderson's EAP counselor. Record, pp. 343-344.

Next, the ALJ determined that Mr. Anderson did not meet the requirements of Section 1.04A and therefore did not satisfy the criteria for a Listing level disorder of the spine; he also determined that "the medical findings contained in the record [were] not equal in severity and duration to any of the Listed findings." Record, p. 344.

The ALJ then considered Mr. Anderson's Residual Functional Capacity, concluding that Mr. Anderson had the RFC to perform

light work, with the ability to stand and walk up to 6 hours in an 8 hour day, the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, an unlimited ability to sit, with the caveat that he required the ability to shift positions, including the ability to alternate between sitting and standing every 45 to 60 minutes, and no ability to climb stairs and ladders, stoop, bend, kneel, crouch, squat or crawl. Record, pp. 344, 349.

With this RFC in mind, the ALJ determined that Mr. Anderson was unable to perform his past work as a maintenance engineer. Record, p. 349. He found, however, that Mr. Anderson was capable of performing other jobs that existed in significant numbers in the national economy — namely, those of office helper, cashier, and rental storage facility clerk. Record, pp. 350-351.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the

Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DIB or SSI must prove that he or she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step

23

analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

Mr. Anderson raises a number of challenges to the ALJ's findings and conclusions. He argues that the ALJ erred at step two when he concluded that his knee and mental impairments were not severe; that the ALJ's RFC and credibility findings were not supported by substantial evidence; that the ALJ's step five findings were based on an incomplete hypothetical to the VE; and that the ALJ failed to follow the instructions given by the Appeals Council and the District Court on remand.

A.   The ALJ's Step Two Findings

Mr. Anderson first argues that the ALJ erred at step two,
when he determined that his back problem was his only severe
impairment.  He argues that, in determining that neither his knee
problem nor his mental impairment was severe, the ALJ ignored
evidence to the contrary; he ignored evidence establishing that
both his knee impairment and his mental impairment were "severe"
in that they significantly interfered with his ability to work.
First, with regard to his knee, Mr. Anderson's own testimony
undermines his argument.  At the hearing before the ALJ on June
7, 2005, Mr. Anderson was asked by his attorney whether his knee
was "a significant problem in your ability to walk or stand" and
he testified that it was not; he testified, consistent with the
ALJ's findings, that "[t]he significant problem was the
sciatica."  Record at 484.  And, significantly, Mr. Anderson
never mentioned his mental impairment at the hearing.  Based on
this testimony, the Court would be hard-pressed to criticize the
ALJ's determination that Mr. Anderson's only severe impairment
was his back problem.

The ALJ's determination on this issue is also supported by
and consistent with the other record evidence. Dr. Kasman's
assessment certainly supports the notion that Mr. Anderson's back
pain was the primary issue and that the knee pain was

intermittent and often absent. Record at 417. Even Dr.

Bielejeski noted that Mr. Anderson's knee issue dealt more with

the crunching sound it made, rather than the pain it caused.

than with the pain. Record, pp. 274-275.

With regard to Mr. Anderson's mental impairment, the record

similarly supports the ALJ's determination that this was not

severe. The records from Mr. Bruce date from 2002 and show a

relatively short course of treatment and a good prognosis.

Record, p. 267. Additionally, the record includes an Adult

Psychiatric Evaluation report prepared on September 18, 2004 by

Dr. Manolito Castillo, which indicated that Mr. Anderson was not,

at the time of the evaluation, being treated for depression and

that he had not sought such treatment after his sessions with Mr.

Bruce. Record, p. 382. After examining and evaluating Mr.

Anderson, Dr. Castillo concluded that Mr. Anderson had done well

on the assessment, suggesting that he did not have any

"significant mental limitations." Record, p. 384. Dr. Castillo

rated Mr. Anderson at a 79 on the Global Assessment of

Functioning Scale, which indicates that "if symptoms are present,

they are transient and expectable reactions to psychosocial

stressors"; this rating indicates that, in Dr. Castillo's view,

Mr. Anderson had "no more than slight impairment in social,

occupational, or school functioning." See GAF Scale, Diagnostic

and Statistical Manual of Mental Disorders, p. 32 (Fourth Ed. 1994). In short, all of the record evidence dealing with Mr. Anderson's mental impairment is consistent with the ALJ's determination that this impairment was not severe.

B.    The ALJ's RFC Findings

Mr. Anderson next challenges the ALJ's RFC findings. He argues that the ALJ's RFC finding is erroneous because he failed to consider the relevant impairments in combination and because he failed to follow SSR 96-8p. First, given the Court's analysis above, the first point is not persuasive. Second, with regard to Mr. Anderson's argument that the ALJ was required to perform a function-by-function analysis, it would seem that he did just that. As this Court interprets SSR 96-8p's "function-by-function" language, the ALJ's written opinion must provide evidence to support his RFC conclusions, but it need not include a specific recitation of every detail of the function-by-function analysis. Here, the ALJ explained what he thought Mr. Anderson could do in terms of maintaining an eight-hour workday, and he explained how he arrived at his conclusions. Whether or not Mr. Anderson or this Court agree with those conclusions is another issue; it is enough to say here that the ALJ's decision comports with SSR 96-8p.

C.    The ALJ's Credibility Findings

Mr. Anderson next challenges the ALJ's credibility findings as being inconsistent with SSR 96-7p. In particular, Mr. Anderson argues that the ALJ erred when he discounted his subjective complaints based upon the lack of objective medical evidence and when he concluded, based on Mr. Anderson's ability to do certain daily activities, that he had the ability to engage in substantial gainful activity.

The ALJ, having heard first hand the testimony and seen first hand the witnesses' demeanor, is in the best position to determine the credibility of witnesses; accordingly, this Court reviews an ALJ's credibility findings with deference, reversing only if the findings are patently wrong. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). But if an ALJ choose to give less than full credit to a particular witness's testimony, he must give specific reasons for doing so. *See, e.g., Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007); SSR 96-7p. The Social Security Regulations require that, in determining credibility, an ALJ must consider several factors, including the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. The ALJ must justify his credibility

28

findings with specific reasons, and his findings must be supported in the evidence, *see Steele,* 290 F.3d at 941-42; under Social Security Ruling 96-7p, an ALJ's evaluation of an applicant's credibility must be specific enough to make clear to the reviewing court how much weight the ALJ gave to the applicant's testimony and the reasons for that decision. *See Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir. 2007); *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).

First, it is clear that the ALJ discounted Mr. Anderson's credibility, in part, because, in his view, the objective medical evidence did not justify the severity with which Mr. Anderson described his pain. Had this been the ALJ's sole reason for disbelieving Mr. Anderson, the Court would remand; an ALJ may not discredit a claimant's testimony about his pain and limitations solely because there is no objective medical evidence supporting it. SSR 96-7p; 20 C.F.R. § 404.1529(c)(2). But the ALJ gave other reasons for discounting Mr. Anderson's credibility. Unfortunately, some of them were simply wrong.

First, in discounting Mr. Anderson's complaints, the ALJ noted that he had pursued a conservative course of treatment, had declined to pursue recommended treatments (including epidural injections and the use of a cane), and had not scheduled regular doctor visits. In assessing credibility, infrequent treatment or

failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment. SSR 96-7p. But, before the ALJ counted this against Mr. Anderson, he should have explored the reasons why Mr. Anderson didn't see his doctor more, or why he didn't pursue the epidural injections; the ALJ "must not draw any inferences" about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care. *Id.*

Additionally, the ALJ dismissed Mr. Anderson's testimony concerning his pain and the debilitating effects of his pain medication, in no small measure, because, in his view, it was inconsistent with what he said he could do in terms of daily activities. In particular, the ALJ determined that, because Mr. Anderson had testified that he could read and use the computer, that undermined his testimony that his medication left him too drowsy to sustain gainful employment. It is true that Mr. Anderson testified that he could read and use the computer. But, specifically, his testimony was that he could do so for maybe 30 minutes at a time. It is quite a stretch to find that an ability to read for 30 minutes at a time could translate into having sufficient concentration to sustain full-time employment. There's clearly something missing there, and the ALJ failed to

build that bridge from the evidence to his conclusion.

The ALJ was also too dismissive of Janice Anderson's testimony; he essentially disbelieved her solely because of her relationship with Mr. Anderson, noting that "I cannot disregard the natural tendency of a spouse to support the other or the wife's pecuniary interest in the outcome of this matter." Record, p. 347. Using this reasoning, any spouse, parent or child of a claimant would necessarily lack credibility simply because of his or her relationship with the claimant, and that is clearly not what the regulations envision. Without more, the Court must find that the ALJ's credibility determination as to Mrs. Anderson is inappropriate.

D.    The VE's Testimony & The ALJ's Step Five Findings

Mr. Anderson next argues that the ALJ gave an incomplete hypothetical to the VE, thereby making his step five findings improper. Specifically, Mr. Anderson argues that the ALJ's hypothetical to the VE did not include all of his limitations and contained erroneous conclusions regarding the type of work Mr. Anderson could perform. For example, Mr. Anderson argues, the ALJ's hypothetical claimant could sit without limitation and required the ability to shift position, from sitting to standing, every 45 to 60 minutes. Neither of these was true of Mr. Anderson; he argues that the record evidence demonstrated that he

needed to shift position every 10 minutes or so and could not endure prolonged sitting. Nor, Mr. Anderson argues, did the ALJ's hypothetical include any of the limitations imposed by his mental impairment.

Significantly, the ALJ's hypothetical did not include one of the limitations ultimately adopted - that he was totally unable to climb stairs, stoop and bend, crouch and squat. Mr. Anderson argues that, had the VE been given this limitation, he would necessarily have concluded that the jobs he identified (office helper, cashier and rental storage facility clerk) would all have been beyond the scope of his abilities.

The Court disagrees with Mr. Anderson on several of these counts - first, given the Court's finding above, the Court finds no fault with the ALJ's failure to consider Mr. Anderson's mental impairment at step 5. So too with the limitation concerning his ability to sit and his need to shift positions periodically. As explained above, the record supports the ALJ's finding that Mr. Anderson needed to shift positions (from sitting to standing and vice versa) every 45 to 60 minutes. Although there is some evidence in the record to suggest that Mr. Anderson needed to shift positions more frequently - in particular, he seemed to demonstrate at the hearing that he could not sit comfortably for that long - there is substantial evidence in the record to

support the ALJ's finding on this issue. Indeed, Mr. Anderson's attorney conceded that Mr. Anderson's limitations are not as severe as he argues; in a June 3, 2005 letter to the Office of Hearings and Appeals, he noted that "Mr. Anderson needs to be able to change positions approximately once every hour for an unspecified period of time." Record, at 370. In a report dated May 3, 2002, Dr. Lund indicated that Mr. Anderson could sit, stand and walk a total of 2 hours in an 8-hour workday and that he could sit, stand and walk for 1 hour at any given time without interruption. Record, p. 247. Dr. Madireddi and Dr. Kasman both indicated that Mr. Anderson needed to be able to shift position to relieve his pain and discomfort – from sitting to standing and vice versa. But neither of them specified the timeframe within which he would need to move. Dr. Madireddi indicated that, as of September 15, 2004, Mr. Anderson could stand and walk about 6 hours in an 8-hour workday, and he could sit, but he must periodically alternate sitting and standing to relieve pain or discomfort. Record, pp. 378-379. And Dr. Kasman indicated that Mr. Anderson's pain becomes worse with prolonged sitting or standing; he did not define "prolonged." Record, p. 437. In short, although there is some evidence to support Mr. Anderson's argument that he needed to shift positions more frequently than the ALJ determined in his RFC, there is also substantial evidence

to support the ALJ's finding that he could sit for 45 minutes to an hour without having to shift positions.

Having said that, the Court agrees with Mr. Anderson that the ALJ's hypothetical failed to factor in the limitation concerning his inability to climb stairs, stoop and bend, crouch and squat.

Even more troubling, the ALJ failed to consider the affects of Mr. Anderson's pain medication and failed to explain how, if his testimony was credited, he could sustain gainful employment while medicated. Both Mr. Anderson and his wife testified that the medication he takes for pain renders him pretty much useless; they both testified that, when he's on the medication, he is like a zombie. Dr. Madireddi, who examined Mr. Anderson, as well as his medical records, noted that Mr. Anderson was taking MS Contin to control his pain and advised that "this raised safety issues in most jobs requiring alertness." Record, p. 380.

The VE testified that, if an employee's concentration, persistence and pace were interrupted or affected to the extent that he was required to take breaks of 15 to 20 minutes out of an hour, every hour, as a result of pain or because of the affects of medication, the job base she had previously identified was 100% eroded; that is, if Mr. Anderson was off-task, because of his pain or his medication, to the extent he claimed to be, there

wasn't a single job he could do. Record at 495. The VE also testified that, if he was required, because of his pain, to shift positions, not just by standing up, but by walking around for more than four or five minutes, he would also be essentially unemployable. Record at 496. Thus, if the testimony of Mr. and Mrs. Anderson were to be believed, according to the VE, Mr. Anderson would be unemployable. Yet the ALJ did not discuss the evidence concerning the effects of Mr. Anderson's medication. In his decision, the ALJ noted that "[w]hile the claimant does take MS Contin, he is able to use a computer, and read, which shows an adequate level of concentration." Record, p. 349. Specifically, Mr. Anderson testified that he could probably read for a 30 minute stretch; this is hardly a sufficient bases for the ALJ's finding that he could sustain employment. The ALJ does not seem to have considered the possibility that, although Mr. Anderson is able to read and use a computer sporadically throughout the day, depending on how he's doing at any given time, that might not equate to being able to concentrate sufficiently throughout an 8-hour work day. In short, the ALJ's findings on this issue are inadequate.

D.    The District Court's Instructions on Remand

Finally, Mr. Anderson argues that the ALJ failed to follow the remand instructions and orders issued by the district court

35

and the Appeals Council.  On November 4, 2003, the district court in California issued an order remanding Mr. Anderson's case for a new hearing and decision.  In that order, the court specifically instructed the Appeals Council to send the case back to an ALJ, with directions to "further evaluate the opinion of Plaintiff's treating physician, Dr. Lund," and to "re-evaluate the credibility of Plaintiff's subjective complaints in accordance with the regulations and Social Security Ruling 96-7p, and to consider the testimony of Plaintiff's wife."  Anderson v. barnhart, No. CIV-S-03-0503 GGH, Order filed Nov. 4, 2003)(E.D. CA)(attached to Plaintiff's Memorandum in Support of Summary Judgment or Remand).  On March 11, 2004, the Appeals Council issued an order stating that "[t]he United States District Court for the Eastern District of California has remanded this case to the Commissioner of Social Security for further administrative proceedings in accordance with the fourth sentence of section 205(g) of the Social Security Act.  Therefore, the Appeals Council vacates the final decision of the Commissioner in this case and remands the case to an Administrative Law Judge for further proceedings consistent with the order of the court."  Record, p. 353.  The Appeals Council further ordered that the case be assigned to an ALJ, that the ALJ provide Mr. Anderson "an opportunity to appear at a hearing, develop the record pursuant

to 20 C.F.R. §§ 404.1512-404.1518 and/or 416.912-416.918, and issue a new decision." *Id.* On remand, the case was sent back to the same ALJ, who, as explained above, held another hearing.

Dr. Lund indicated, in a report dated May 3, 2002, that Mr. Anderson could occasionally carry up to 10 pounds, but never more than that; that he could sit, stand and walk just 2 hours in a day and sit for just 1 hour at a time; and that he could never climb, stoop, crouch, kneel or crawl. As the ALJ noted in both his first and his second decision, this is inconsistent with the opinions of Dr. Madireddi and Dr. Kasman, who both seemed to think that Mr. Anderson could carry more (up to 20 pounds occasionally and 10 pounds frequently), and sit, stand and walk more (up to 6 hours in an 8-hour workday). In his decision, the ALJ made clear that he had considered Dr. Lund's opinion, but that he had decided to give it less weight than he gave to the opinions of Dr. Madireddi and Dr. Kasman. And he explained his reasons for doing so. Record, p. 347. In his first decision, the ALJ determined that Dr. Lund's opinion concerning Mr. Anderson's RFC was "inconsistent with the medical evidence as a whole." Record, p. 15. The second time around, the ALJ explained that he was again rejecting Dr. Lund's opinion for the same reason; he also added that he was rejecting the opinion because Dr. Lund was no longer seeing Mr. Anderson, because the

report appeared to be based largely on Mr. Anderson's subjective reports, which, the ALJ explained, he did not fully credit; and because Dr. Lund's RFC opinion seemed to be inconsistent with his treatment notes. Record, p. 347. Putting aside the question of whether the Court would agree with these justifications, they do suggest that the ALJ took the district court's remand instructions to heart.

The same is true with regard to the question of Mr. Anderson's credibility. In his first decision, the ALJ explained that he had found Mr. Anderson's subjective complaints of pain to be "not totally credible" because they were not supported by the objective medical evidence and because they appeared to be inconsistent with his very conservative course of treatment. Record, p. 14. The ALJ made no findings in his first decision about Mrs. Anderson's credibility.

In contrast, in his second decision, the ALJ provided a lengthy, detailed explanation of the inconsistencies and exaggerations in Mr. Anderson's testimony that led him to discount his credibility. And he also explained his reasons for discounting Mrs. Anderson's testimony. Putting aside the question of whether those reasons are valid under the regulations (something the Court has already considered), it is clear that the ALJ paid great attention to the question of credibility the

second time around. Accordingly, the Court rejects Mr. Anderson's argument that the ALJ failed to follow instructions on remand.

E. Some Final Thoughts

On remand, the Commissioner is directed to carefully consider, in particular, the evidence concerning the effects Mr. Anderson's pain medication have on his ability to sustain work. The Commissioner should also be mindful that this is the agency's third bite at this apple, with the courts having now remanded the matter twice because of deficiencies in the review process. The Commissioner is also directed to take note of the fact that, under the Medical-Vocational Guidelines, given Mr. Anderson's age and given the ALJ's prior determination that he is limited to light work and has no transferable skills, a finding of disabled would be warranted as of January 26, 2009, Mr. Anderson's 55th birthday. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2. The Court is mindful that Mr. Anderson's date last insured for disability insurance benefits was December 31, 2006, so as a practical matter it may be of no consequence that he is now considered to have attained "advanced age." That will be up to the Commissioner to consider in the first instance.

**CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's credibility findings were deficient because he failed to

comply with SSR 96-7p, and that his RFC findings were deficient because he failed to consider adequately the evidence and testimony concerning the effects Mr. Anderson's pain medication had on his ability to work. Accordingly, the Court grants Mr. Anderson's Motion for Summary Judgment [#21]; the case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

Date: March 5, 2009

E N T E R E D:

_____
ARLANDER KEYS
UNITED STATES MAGISTRATE JUDGE